**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION AT CHICAGO**

Milliman, Inc.

Plaintiff,

v.

Brian Fomby,

Defendant.

Case No.

Date: August 7, 2026
Judge:

**VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF**

Plaintiff Milliman, Inc. ("Milliman"), by and through its attorneys, brings this Complaint against Defendant Brian Fomby ("Defendant") for injunctive and other relief arising from his actual and threatened misuse of Milliman's confidential information and trade secrets, the breach of his contractual and fiduciary duties, and related unfair competition. In support, Milliman alleges as follows:

**NATURE OF ACTION**

1. For years, Defendant Brian Fomby served as a Principal in Milliman's Life Risk, Technology & Consulting ("Life RTC") practice. Milliman entrusted him with two of the practice's most competitively sensitive assets: the pricing strategy for Milliman's actuarial technology and the confidential Roadmap for the evolution of Milliman Integrate®, its cloud-based actuarial modeling platform.

2. By June 1, 2026, however, Defendant knew he was leaving Milliman to lead the North American business of PathWise, Aon's directly competing actuarial technology platform. Despite having made this decision, he chose not to disclose that fact to Milliman.

3. Instead, he remained inside Milliman for more than seven weeks – continuing to receive compensation, access confidential information, influence client relationships, and participate in the business he had already agreed to compete against.

4. During that undisclosed transition period, Defendant created a portable Excel compilation of his entire sent-mail activity, including recipients, subject lines, dates, and other information capable of identifying Milliman clients, contacts, projects, proposals, and business opportunities. The compilation transformed years of relationship and project information into a sortable roadmap that could be searched, copied, retained, and used outside Milliman's systems.

5. During the same period, one of Milliman's largest client relationships was disrupted. Defendant possessed confidential knowledge concerning that relationship. On information and belief, while still obligated to act solely for Milliman, he was operating under undisclosed divided loyalties and acting to advance his own interests and/or those of Aon.

6. On July 20, 2026, Defendant abruptly resigned from Milliman on approximately 24 hours' notice. The next day, Aon announced that he would become North America Managing Director of PathWise, responsible for leading its strategy, overseeing implementation programs, expanding client solutions, advancing strategic relationships, and directing the design and delivery of a product that competes directly with Milliman Integrate®.

7. Defendant's new assignment is not merely employment in the same industry. Aon placed him in charge of the same subjects for which Milliman had entrusted him with its most current and sensitive information: pricing, product strategy, implementation, client relationships, cloud modernization, artificial intelligence, systems integration, data management, and the future development of actuarial technology.

8. Milliman brings this action to prevent Defendant from converting that trust into an unfair competitive advantage. Milliman seeks immediate relief requiring him to preserve and return its information, prohibiting him from using or disclosing its trade secrets and confidential information, and preventing further interference with the client relationships and business opportunities he was obligated to protect.

9. The Parties' Dispute Resolution Agreement requires the underlying dispute to proceed in arbitration, but expressly permits Milliman to seek emergency injunctive relief in court. Milliman thus asks this Court to preserve the status quo and prevent irreparable harm while the parties resolve the merits in the agreed arbitral forum.

**THE PARTIES**

10. Plaintiff Milliman, Inc. ("Milliman" or "the Firm") is a Washington corporation registered to do business in Illinois with a principal place of business in Chicago, Illinois. Milliman maintains a global presence, and performs services throughout the United States and the world, including substantial operations – and the majority of the Life RTC practice – in Chicago, Illinois.

11. Defendant Brian Fomby is a citizen of South Carolina and resides at 1601 Johnson Marina Road; Chapin, South Carolina 29036. During the latter portion of his employment, Defendant was classified as a full time employee of Milliman's Chicago, Illinois office.

**JURISDICTION AND VENUE**

12. This Court possesses jurisdiction over this Action under 28 U.S.C. § 1332(a)(1) because the Parties are citizens from different States and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

13. This Court also possesses federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1836 et. seq., because Milliman's claims include trade secret concerns related to products and services used in, and intended for use in, interstate and foreign commerce.

14. This Court possesses supplemental jurisdiction under 28 U.S.C. § 1367(a) over Milliman's related state-law claims because those claims arise from the same nucleus of operative facts and from part of the same case or controversy as Milliman's federal claims.

15. Venue is proper in this Court under 28 U.S.C. § 1391(a), in that a substantial part of the events or omissions giving rise to Milliman's claims occurred in Chicago, Illinois and the damages to Milliman are felt in this judicial district.

16. This Court has personal jurisdiction over Defendant under 735 ILCS 5/2-209. Defendant was classified as an employee of Milliman's Chicago office located at 71 S. Wacker Drive, 31st Floor; Chicago, Illinois 60606. Notably, the vast majority of the Milliman Life RTC practice works out of Milliman's Chicago office, and Defendant breached his fiduciary duties in Illinois. Additionally, a substantial amount of Milliman trade secrets and confidential information were developed in Illinois and Milliman's information is stored in Illinois. Further, the injuries resulting from Defendant's conduct at issue in this litigation were and continue to be experienced by Milliman in Illinois.

17. This Court has authority to grant the requested provisional injunctive relief because the parties expressly agreed that either party may seek a temporary restraining order or preliminary injunction from a court of competent jurisdiction to preserve the status quo pending arbitration.

## FACTUAL ALLEGATIONS

### A. Milliman's Life RTC Practice.

18. Milliman, Inc. is a global actuarial and consulting firm that provides actuarial, financial, risk-management, technology, and related professional services to clients in the insurance and financial-services industries.

19. Among its businesses, Milliman operates a Life RTC practice that develops, implements, supports, and advises clients concerning actuarial modeling technology used by life and annuity insurers and other participants in the life-insurance industry.

20. Milliman's Life RTC practice provides sophisticated technology and related consulting services to life insurers, annuity providers, reinsurers, asset managers, and other institutional clients.

21. The practice operates in a highly specialized and competitive market in which relatively few firms possess the actuarial, technological, implementation, and client-service capabilities required to design and deliver complex life-insurance modeling solutions.

22. Milliman has invested substantial time, money, and professional resources in developing its technology, implementation methods, client solutions, pricing strategies, service-delivery processes, and relationships with clients and prospective clients.

23. Milliman's competitive position depends in substantial part upon information that is not publicly available, including confidential information concerning:

a. existing and prospective clients;

b. client contacts, decision-makers, requirements, preferences, and business priorities;

c. proposals, pricing, fee structures, project scopes, and contract terms;

d. product strategy and development;

e. implementation processes, project plans, and delivery methodologies;

f. software functionality, technical architecture, modeling capabilities, and product road maps;

g. strategic relationships and business-development opportunities;

h. internal financial information, forecasts, and practice strategy; and

i. the experience, qualifications, responsibilities, and deployment of Milliman personnel.

24. This information provides economic value to Milliman because it is not generally known to Milliman's competitors and could be used by a competitor to accelerate its own development, target Milliman clients and prospects, undercut Milliman's pricing, anticipate Milliman's strategy, recruit Milliman personnel, or otherwise compete unfairly.

25. Milliman restricts access to this information to employees and principals who need it to perform their work and requires those individuals to protect the information from unauthorized use or disclosure.

**B. Defendant's Access to Milliman Confidential Pricing Strategy & Technology Roadmap.**

26. Defendant worked in Milliman's Life RTC practice.

27. Although the Life RTC practice provides both consulting and technology services, Defendant's work was concentrated principally on the technology side of the practice.

28. In that role, Defendant held substantial responsibility for the pricing model for Milliman's life actuarial technology products and services, and complete access to the Technology Roadmap for the strategic evolution and development of those products. These two subjects are critical to Milliman's competitive strategy.

29. Defendant did not merely receive or review this information. He participated directly in developing, shaping, and implementing Milliman's pricing strategy and had access to the Technology Roadmap.

30. As a result, Defendant possessed detailed, current, and nonpublic knowledge concerning both how Milliman intended to commercialize its actuarial technology and how Milliman intended to develop and evolve that technology over the coming years.

***i. Milliman's Confidential Pricing Strategy***

31. Milliman recently undertook a significant transformation of the pricing strategy for its life actuarial technology products and services.

32. This pricing transformation was not publicly disclosed in sufficient detail to permit a competitor to understand how Milliman develops, structures, and applies its pricing framework to client opportunities.

33. The pricing strategy includes confidential information concerning Milliman's:

a. pricing architecture;

b. valuation methodology;

c. pricing variables and assumptions;

d. pricing models and frameworks;

e. implementation and usage considerations;

f. commercial planning and analyses;

g. pricing governance and decision-making; and

h. anticipated application of the framework to business opportunities.

34. Defendant was instrumental in defining and building this pricing model and had substantial ownership of the strategy.

35. Through that work, Defendant gained detailed knowledge of how Milliman intended to price and position its technology across business use cases and market opportunities.

36. A competitor with access to this information could anticipate Milliman's pricing approach, undercut Milliman selectively, structure competing proposals to exploit Milliman's pricing methodology, and avoid the substantial time and expense required to develop an equivalent commercial model.

37. Knowledge of Milliman's pricing strategy would also permit a competitor to target particular clients and opportunities with a more informed understanding of Milliman's likely pricing, value proposition, and negotiation strategy.

***ii. Milliman's Confidential Technology Roadmap***

38. Defendant also had complete access to Milliman's Technology Roadmap, which is Milliman's plan for the strategic evolution of its life actuarial technology products.

39. The Roadmap identifies Milliman's planned investments, technical priorities, development sequence, product objectives, and anticipated methods for improving and expanding its technology.

40. The Roadmap is not merely a list of general industry trends. It reflects Milliman's specific technical and commercial decisions concerning where it will invest, how its products will evolve, which capabilities it will prioritize, and how those capabilities will be delivered to clients. The Roadmap includes at least six principal areas of strategic development:

41. **Asset-Modeling Capabilities:** Milliman planned substantial investment in enhanced asset-modeling capabilities, including the ability to model assets more effectively within actuarial and financial projections.

42. A competitor with advance knowledge of these plans could prioritize competing functionality, alter its own product-development schedule, or position its existing products against capabilities Milliman had not yet announced.

43. **Cost and Performance Optimization:** Actuarial modeling requires substantial computing resources and can be expensive and time-consuming.

44. Knowledge of these plans and their status would allow a competitor to identify Milliman's technical priorities, replicate or counter its performance strategy, and avoid the experimentation and investment required to independently reach similar conclusions.

45. **Artificial Intelligence:** Milliman developed a confidential strategy concerning how artificial intelligence would be incorporated into its actuarial technology products and client offerings.

46. A competitor with access to this strategy and their status could accelerate its own AI development, target the same use cases, and position competing functionality before Milliman completed or announced its plans.

47. **Cross-Platform Integration:** Milliman also developed confidential plans concerning the integration of its systems with clients' existing technology platforms.

48. A competitor with advance knowledge of Milliman's integration strategy and its status could adapt its own products and proposals to address the same client concerns or exploit anticipated limitations in Milliman's approach.

49. **Cloud Migration and Software-as-a-Service Delivery:** Milliman has made significant strategic commitments to cloud-based technology and software-as-a-service delivery.

50. This information would allow a competitor to understand Milliman's current status, anticipate when upgrades will be delivered, and adjust its own development and sales strategy in order to target clients during the transition period.

51. **Data Management:** Milliman's actuarial technology depends not only on modeling capability, but also on the ability of clients to manage, structure, access, and use data throughout the actuarial process.

52. Milliman continues to invest in improving data-management functionality.

53. A competitor with knowledge of Milliman's plans and their status could identify Milliman's current technological state, anticipate its future capabilities, pursue the same third-party relationships, and develop competing functionality without independently undertaking the same analysis.

**C. Defendant's Knowledge of the Technology Roadmap.**

54. Defendant had complete access to Milliman's Technology Roadmap.

55. Defendant therefore possesses current and detailed knowledge concerning:

a. Milliman's present technology capabilities;

b. Areas of focus and opportunities;

c. planned enhancements;

d. development priorities;

e. technical architecture;

f. anticipated timing;

g. investment decisions;

h. third-party technology strategy;

i. client implementation considerations; and

j. Milliman's long-term product vision.

56. This information is particularly sensitive because it reveals both where Milliman intends to compete and invest.

57. A competitor could use this information not only to copy Milliman's planned improvements, but also to exploit its advance knowledge of Milliman's development priorities, product roadmap, and planned enhancements before those enhancements are brought to market.

**D. Defendant's Senior Role and Position of Trust at Milliman.**

58. Defendant was employed by Milliman as a Principal in Life RTC practice as a Principal of Sales & Customer Relationship Management ("CRM").

59. Although Defendant resided in South Carolina, a substantial part of his work was directed through and connected to Milliman personnel and operations in Chicago, Illinois.

60. In fact, Defendant was expressly identified as an employee of the Chicago Office. (**Exhibit 1**, Offer Letter.)

61. Approximately 80% of the relevant Milliman practice personnel are located in Illinois, and Defendant regularly worked with, reported to, received direction from, or collaborated with Milliman personnel located in Illinois.

62. In his senior role as Principal of Sales & CRM, Defendant advised clients in North America, Europe and Asia concerning actuarial technology and related business solutions.

63. Defendant's responsibilities broadly included pricing and sales, therefore he had access to technology roadmaps for existing and forthcoming Milliman products.

64. Defendant maintained significant professional relationships with Milliman clients and prospective clients, including many of Milliman's largest and most prestigious accounts in the life insurance and annuity industries.

65. Notably, the life insurance industry contains a limited number of customer companies, with approximately 50 major companies in North America.

66. Defendant also worked closely with Milliman employees and principals involved in Life RTC, providing clients in the life insurance industries with technology solutions.

67. As indicated by his title, Defendant was also intimately involved in customer sales and CRM.

68. In fact, Defendant was one of only six (6) Principals invited to participate in a weekly Life RTC sales and client satisfaction call, referred to as the "Pipeline Call."

69. During the Pipeline Call, Defendant and other Principals and Equity Principals regularly discussed confidential information and trade secrets, such as Life RTC's confidential pricing and Technology Roadmap.

70. The Pipeline Call also gave Defendant an intimate and direct look at potential customers, as well as client management discussions regarding existing customer accounts.

71. Through his position, Defendant was entrusted with broad access to Milliman's confidential information and trade secrets relating to its Life RTC practice.

72. Defendant's access included, among other things, confidential information concerning:

a. Milliman's clients and prospective clients;

b. the identities and contact information of client decision-makers;

c. current and anticipated client needs;

d. pending proposals and business opportunities;

e. client-specific project scopes, and commercial terms;

f. product and implementation strategy;

g. internal project plans and methodologies;

h. Milliman's technology, software, models, databases, and related processes;

i. strategic and financial information concerning the Life Technology Solutions practice; and

j. Milliman employees and teams responsible for delivering these services.

73. Defendant would not have received access to this information but for his senior position of trust and confidence with Milliman and his obligations to preserve its confidentiality.

**E. Defendant's Contractual Obligations.**

74. On or about November 11, 2024, Defendant entered into an Employee Trade Secret and Client Information Agreement with Milliman. (**Exhibit 2,** Employee Trade Secret and Client Information Agreement.)

75. Under that agreement, Defendant acknowledged that Milliman's business involves performing services for clients using information that Milliman considers confidential.

76. The agreement defines "Confidential Information" to include nonpublic information relating to Milliman's business, technology, clients, prospects, finances, plans, proposals, practices, client lists, client contacts, client requirements and preferences, systems, processes, trade secrets, methods, know-how, databases, compilations, software, guidelines, studies, and project models.

77. Defendant agreed that he would use Milliman's Confidential Information only as necessary to provide services to Milliman clients within the scope of his employment.

78. Defendant further agreed to keep Milliman's Confidential Information strictly confidential and not to copy, use, or disclose that information except as necessary to perform his duties for Milliman.

79. Defendant also agreed that, upon termination of his employment, he would return to Milliman all materials furnished to him in connection with his employment, including all Confidential Information.

80. The agreement recognizes that unauthorized disclosure would cause Milliman irreparable injury and entitles Milliman to seek injunctive relief for an actual or threatened breach.

81. On or about November 11, 2024, Defendant also entered into an Employee Non-Solicitation Agreement with Milliman. (**Exhibit 3**, Employee Non-Solicitation Agreement.)

82. That agreement restricts Defendant for two years following termination from soliciting or accepting consulting assignments from clients with whom he had "professional contact" during the preceding two years.

83. The agreement defines "professional contact" to include clients for whom Defendant performed work and clients about whom he accessed or used information.

84. The agreement further restricts Defendant, if employed by a firm that accepts assignments from a covered Milliman client, from working on assignments for that client for two years following his departure.

85. Defendant also agreed not to hire or solicit the employment of Milliman Group employees for two years following termination.

86. On March 18, 2025, Defendant executed Milliman's Mutual Dispute Resolution Agreement (**Exhibit 4**, Mutual Dispute Resolution Agreement.)

87. The Arbitration Agreement requires Milliman and Defendant to arbitrate covered disputes, expressly including claims for breach of contract, misappropriation of trade secrets, unfair competition, and tort claims.

88. The Arbitration Agreement nevertheless expressly authorizes either party to seek provisional relief – including a temporary restraining order or preliminary injunction – from a court of competent jurisdiction when necessary to prevent an arbitration award from being rendered ineffectual and to preserve the status quo pending arbitration.

89. Milliman seeks only the provisional judicial relief authorized by the Arbitration Agreement. The remaining merits of the parties' dispute will proceed through the dispute-resolution procedures required by that agreement.

**F. Defendant's Undisclosed Plans to Join Aon.**

90. Aon is a global professional services firm that competes with Milliman in providing actuarial consulting, technology, and related services to insurers and other financial services clients.

91. Aon's Life Solutions business provides actuarial advisory services and life-actuarial modeling technology to life and annuity insurers and other participants in the life sector.

92. Aon markets PathWise as its life-actuarial modeling technology, which directly competes with Milliman's Integrate® technology.

93. No later than June 1, 2026, Defendant knew that he would be joining Aon.

94. A spreadsheet dated or created on or about June 1, 2026, on Defendant's Milliman laptop reflects compensation or salary information associated with Defendant's anticipated employment with Aon.

95. Despite knowing by at least June 1 that he intended to join a direct competitor, Defendant did not inform Milliman of his plans.

96. Defendant instead continued to serve as a Milliman Principal and continued to utilize his access to Milliman's confidential information, client information, technology information, and business strategies in service of himself and/or Aon.

97. During the period after he knew he would join Aon but before he resigned, Defendant continued participating in client matters, internal meetings, product discussions, strategic planning, and other matters, including weekly Pipeline Meetings.

98. In fact, Defendant not only participated in his normal meetings, he also took the initiative to go outside his normal chain of command to gather sensitive pricing, commercial, technological, and other strategic information concerning numerous Milliman offerings. Upon information and belief, Defendant sought information extending beyond the products and services for which he was directly responsible, including offerings that Aon competes with or has expressed an intention to compete with, thus obtaining information that could be used for the competitive benefit of himself and/or Aon.

99. During the period when Defendant knew he would join Aon – but before he informed Milliman of his plans – Milliman experience a disruption in one of its largest customer relationships.

100. Upon information and belief, while still employed as Principal of Milliman, Defendant utilized Milliman confidential information and/or trade secrets to disrupt this customer relationship.

101. Milliman continues to investigate Defendant's access to, use of, and handling of Milliman confidential information and trade secrets during this period.

**G. Defendant's Connection to Aon and PathWise.**

102. Upon information and belief, no later than June 1, 2026, Aon made an offer to Defendant to serve as North America Managing Director of PathWise, Aon's competing life actuarial modeling technology.

103. On July 21, 2026, Aon publicly announced that Defendant would lead PathWise strategy in North America, oversee implementation programs, expand client solutions, advance strategic relationships, and oversee the design and delivery of PathWise solutions. (**Exhibit 5**, Press Release.)

104. These responsibilities substantially overlap with the pricing, technology development, implementation, and client strategy responsibilities Defendant performed for Milliman.

105. In his Aon role, Defendant will necessarily and inevitably make decisions that directly overlap with his former duties at Milliman.

106. Milliman's confidential pricing strategy and Technology Roadmap would be directly useful to Defendant in performing those responsibilities for Aon.

107. Among other things, the information would enable Aon and Defendant to:

a. anticipate Milliman's future product capabilities;

b. utilize advance knowledge of Milliman's product roadmap to position competing offerings more effectively;

c. accelerate competing product development;

d. adjust PathWise's product-development sequence;

e. target the same client use cases;

f. structure competing pricing models;

g. undercut or counter Milliman's pricing strategy;

h. prioritize competing AI, cloud, data, asset-modeling, and integration capabilities; and

i. approach Milliman clients with knowledge of Milliman's strategic direction.

**H. Defendant Creates a Portable Index of His Sent-Mail Activity.**

108. After deciding to join Aon, but prior to his departure, Defendant exported information concerning his sent email into an Excel spreadsheet.

109. The spreadsheet included information such as email recipients, subject lines, dates, and other sent-message data.

110. The spreadsheet created a portable and sortable compilation of Defendant's communications, including communications with or concerning Milliman clients, prospective clients, projects, business opportunities, and personnel.

111. Such a compilation could be used to identify and organize:

a. clients and client contacts;

b. recent and active client relationships;

c. projects and proposals;

d. internal and external personnel associated with particular matters;

e. pending opportunities;

f. subjects discussed with clients; and

g. the timing and frequency of professional communications.

112. Defendant had no legitimate business need to create and retain a portable spreadsheet containing an index of his sent-message activity for use following his resignation from Milliman.

113. Milliman is presently conducting a forensic examination of Defendant's Milliman-issued laptop to determine:

a. when and how the spreadsheet was created;

b. what information it contained;

c. whether Defendant sorted, filtered, modified, or supplemented it;

d. where the spreadsheet was stored;

e. whether it was copied, transferred, emailed, uploaded, printed, renamed, or deleted;

f. whether Defendant used personal email, external storage, cloud storage, or other unauthorized means to transfer Milliman information; and

g. whether he engaged in other downloading, copying, deletion, concealment, or transfer activity.

114. Milliman's investigation is ongoing, and Milliman reserves the right to supplement these allegations as additional facts become known.

## I. Defendant Abruptly Resigns From Milliman With Only Twenty-Four Hours' Notice.

115. On July 20, 2026, Defendant abruptly resigned from Milliman.

116. The abrupt notice deprived Milliman of a reasonable opportunity to:

a. transition Defendant's client relationships and projects;

b. determine the status of his ongoing assignments;

c. review his handling of Milliman information;

d. protect pending proposals and client opportunities;

e. preserve relevant electronic evidence; and

f. take ordinary steps associated with the departure of a senior principal.

117. Defendant returned his Milliman-issued laptop, which is now being examined by a retained forensic specialist.

118. Milliman has also taken steps to preserve and collect Defendant's relevant email, Teams communications, files, and other electronically stored information.

119. Milliman's preliminary review has identified communications and electronic activity that raise substantial concerns regarding Defendant's conduct before his departure.

**J. The Very Next Day, Milliman's Direct Competitor, Aon, Announces That Defendant Will Lead Efforts Regarding Their Competitive Technology.**

120. On July 21, 2026, Aon publicly announced that it had appointed Defendant as North America Managing Director of PathWise within Aon's Strategy and Technology Group, effective July 27, 2026. *See* **Exhibit 5**.

121. According to Aon's announcement, Defendant will report to Van Beach, Aon's Global Head of Life Solutions.

122. Aon stated that Defendant will:

a. lead Aon's PathWise strategy in North America;

b. oversee implementation programs;

c. expand client solutions;

d. advance strategic relationships; and

e. oversee the design and delivery of PathWise solutions.

123. Aon describes PathWise as its life-actuarial modeling technology and states that its Life Solutions team provides complementary actuarial advisory services and life-reinsurance capabilities to life and annuity insurers, asset managers, private-equity firms, and other stakeholders.

124. Aon expressly emphasized Defendant's experience helping clients use technology to make business decisions and stated that his experience would help Aon expand its offerings.

125. Defendant himself stated that he was joining Aon because advances in actuarial technology were creating new opportunities and because clients sought providers capable of translating innovation into business outcomes.

126. Aon's announcement specifically identified Defendant's prior service as a Principal in Milliman's Life Technology Solutions practice and highlighted his experience advising clients globally.

127. The responsibilities Aon publicly assigned to Defendant substantially overlap the areas in which Defendant worked for Milliman.

128. In both positions, Defendant is or was responsible for actuarial technology, implementation programs, client solutions, strategic relationships, and the design and delivery of services to life and annuity insurers.

129. Defendant's new position places him in direct competition with the Milliman practice in which he served as a Principal.

130. It also places him in a position in which Milliman's confidential information concerning clients, implementation strategies, pricing, product development, personnel, and business opportunities would be immediately useful.

### K. Defendant's Knowledge And Conduct Threaten Immediate, Irreparable Harm to Milliman.

131. Defendant possesses recent and detailed knowledge of Milliman's Life RTC practice, including its clients, prospects, personnel, technology, implementation strategies, pricing, proposals, and business plans.

132. Defendant also possesses recent knowledge of Milliman's strengths, investment priorities, current initiatives, pending opportunities, and relationships with clients and prospects.

133. Aon has hired Defendant to lead and expand a competing actuarial-technology business in North America.

134. His new responsibilities require him to make decisions concerning the same types of client solutions, implementation programs, strategic relationships, and technology services that he handled at Milliman. Specifically:

| **Milliman Information** | **Competitive Use By Aon** |
|---|---|
| Pricing model | Predict, undercut, or counter Milliman proposals |
| Asset-modeling roadmap | Prioritize competing functionality |
| Cost/performance strategy | Replicate efficiency gains and avoid development costs |
| AI roadmap | Target the same use cases and accelerate competing features |
| Cross-platform integrations | Target the same use cases and accelerate features |
| Cloud-migration plan | Target Milliman's current structure and pursue the same plans |
| Confidential client information | Target Milliman clients based on confidential knowledge of their business plans, technology, strategies, and priorities |
| Data-management strategy | Target Milliman's current structure and pursue the same third-party solutions |

135. Defendant's work for Aon therefore creates a substantial and immediate risk that Milliman's confidential information and trade secrets will be used or disclosed, whether deliberately or inevitably, for Aon's competitive benefit.

136. The risk is heightened by:

a. Defendant's knowledge by at least June 1 that he intended to join Aon;

b. his continued access and even aggressive pursuit of Milliman confidential information and trade secrets after that date;

c. his creation of a portable spreadsheet cataloguing his sent-mail activity;

d. his abrupt resignation on approximately 24 hours' notice;

e. the substantial overlap between his Milliman role and his announced Aon role; and

f. Aon's stated intention that Defendant expand client solutions and strategic relationships in direct competition with Milliman.

137. Without injunctive relief, Aon and Defendant will have an unfair opportunity to use Milliman's investment, information, and relationships to accelerate Aon's competing business.

138. Once Milliman's confidential information has been disclosed or used by a competitor, the secrecy and competitive value of that information cannot be restored.

139. Disclosure would permit Aon to anticipate Milliman's strategy, target its clients and prospects, compete against its pending proposals, recruit its personnel, and avoid substantial time and expense otherwise necessary to develop equivalent knowledge.

140. The resulting harm to Milliman's client relationships, goodwill, competitive position, and confidential information would be difficult or impossible to quantify fully in money damages.

141. Milliman has acted promptly upon learning the material facts concerning Defendant's departure and new position.

142. Milliman seeks narrowly tailored emergency relief to preserve the status quo, prevent the use or disclosure of its confidential information and trade secrets, require the return

and preservation of its property, and protect its clients and employees while the parties proceed to arbitration as required by their Agreement.

## CLAIMS FOR RELIEF

### Count I: Actual and Threatened Misappropriation of Trade Secrets (Defend Trade Secrets Act, 18 U.S.C. § 1836)

143. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

144. Milliman owns and possesses valuable trade secrets relating to its Life RTC practice and its Milliman Integrate actuarial technology platform.

145. Milliman's trade secrets include detailed, nonpublic information concerning, among other things:

a. Milliman's recently developed pricing architecture for its life actuarial technology products, including its transition from more standardized software and consumption-based pricing to pricing based upon value, client business use cases, implementation scope, product utilization, and other commercial considerations;

b. the variables, assumptions, valuation methodologies, client criteria, commercial parameters, and implementation considerations Milliman uses or intends to use in pricing;

c. Milliman's strategic technology roadmap for the evolution and development of Milliman Integrate®; and

d. Milliman's planned investments, technical priorities, sequencing, architecture, resource allocation, and implementation strategies concerning asset-modeling capabilities.

146. Milliman's confidential analysis of the technical methods by which it intends to reduce the computing cost and improve the speed and performance of actuarial modeling, including through operating systems, hardware, architecture, and related infrastructure;

147. Milliman's specific plans and use cases for incorporating artificial intelligence into its actuarial technology products and client solutions;

148. Milliman's technical and commercial plans for integrating Milliman technology with client systems and third-party platforms;

149. Milliman's plans, timing, technical dependencies, implementation goals, and client-transition strategy for remaining desktop-installed components and completing the migration of its technology to a fully cloud-based software-as-a-service model;

150. Milliman's assessment of its existing data-management capabilities, identified limitations, future architecture, integration strategy, and plans to use selected third-party capabilities to upgrade data management within the actuarial process; and related product-development plans, client strategies, pricing information, implementation methods, technical evaluations, business opportunities, and competitive analyses.

151. The trade secrets identified above are not general concepts such as cloud computing, artificial intelligence, data management, or value-based pricing. Rather, they consist of Milliman's particular nonpublic plans, technical and commercial decisions, methodologies, assumptions, analyses, architecture, priorities, sequencing, timing, and implementation strategies within those areas.

152. Milliman derives independent economic value from the fact that this information is not generally known to, and is not readily ascertainable through proper means by, competitors or other persons who could obtain economic value from its use or disclosure.

153. Among other things, a competitor possessing this information could anticipate Milliman's future product capabilities, leverage advance knowledge of Milliman's product development priorities, replicate or counter Milliman's development strategy, accelerate competing product development, avoid substantial research and development costs, target the same client use cases, anticipate Milliman's pricing and negotiation approach, and compete more effectively against Milliman for clients and business opportunities.

154. Milliman has invested substantial time, money, technical expertise, and professional resources in developing the information described above.

155. Milliman has taken reasonable measures to preserve the secrecy of its trade secrets, including, among other things:

a. limiting access to employees and principals with a business need to know;

b. maintaining the information on access-controlled and password-protected systems;

c. requiring employees and principals with access to the information to enter confidentiality and trade-secret agreements;

d. restricting unauthorized use, copying, retention, and disclosure of confidential information;

e. requiring the return of Milliman information upon termination of employment; and

f. maintaining policies concerning the protection and proper use of Milliman information.

156. Milliman's trade secrets relate to products and services used in, or intended for use in, interstate and foreign commerce. Milliman provides its actuarial technology and related

services to life and annuity insurers and other institutional clients throughout the United States and internationally.

157. Defendant acquired knowledge of Milliman's trade secrets through his employment as a principal in Milliman's Life Risk, Technology, and Consulting practice and through his direct responsibility for Milliman's pricing strategy and his access to the Technology Roadmap.

158. Defendant was instrumental in defining and developing Milliman's transformed pricing model and possessed detailed knowledge of how Milliman intended to structure, value, negotiate, and implement pricing for existing and prospective clients.

159. Defendant also had unfettered access to Milliman's Technology Roadmap, including the roadmap's technical priorities, product-development strategy, architecture, timing, resource-allocation decisions, and implementation plans.

160. Defendant obtained this information solely because Milliman placed him in a senior position of trust and confidence and permitted him access for the limited purpose of performing his duties for Milliman.

161. Defendant knew that Milliman regarded the information as confidential and proprietary and that he was prohibited from retaining, using, copying, or disclosing it for any purpose other than the performance of his duties for Milliman.

162. Defendant expressly agreed to maintain Milliman's Confidential Information in strict confidence, to use it only in connection with his work for Milliman, and to return all Milliman information upon the termination of his employment.

163. By at least June 1, 2026, Defendant knew that he would leave Milliman to join Aon, a direct competitor in the market for life actuarial technology and related consulting services.

164. Although Defendant had decided to join Aon, he continued to occupy his position as a Milliman Principal and retained access to Milliman's confidential information and trade secrets.

165. During this period, Defendant created or caused to be created an Excel spreadsheet containing a portable and sortable compilation of his sent-email activity, including recipients, subject lines, dates, and other information capable of identifying Milliman clients, contacts, projects, proposals, business opportunities, and personnel.

166. The deliberate creation of that compilation converted information contained within Milliman's email system into a separate file capable of being searched, sorted, copied, transferred, retained, and used outside Milliman's systems.

167. On July 20, 2026, Defendant abruptly resigned from Milliman on approximately 24 hours' notice.

168. Shortly thereafter, Aon publicly announced that Defendant would become North America Managing Director of PathWise, Aon's competing life actuarial modeling technology, and would lead PathWise strategy in North America, oversee implementation programs, expand client solutions, advance strategic relationships, and oversee the design and delivery of PathWise solutions.

169. Defendant's responsibilities at Aon substantially overlap the responsibilities through which he developed and acquired Milliman's trade secrets.

170. In his Aon position, Defendant will make or materially influence decisions concerning actuarial-technology strategy, product development, pricing and commercialization, implementation programs, computing performance, artificial intelligence, cloud delivery, systems integration, data management, client solutions, and strategic relationships.

171. Milliman's nonpublic pricing strategy and technology roadmap would be directly and immediately useful to Defendant in performing those duties and to Aon in developing, positioning, pricing, and selling PathWise in competition with Milliman Integrate®.

172. On information and belief, Defendant has retained, copied, transferred, acquired, or otherwise maintained possession or control of Milliman trade-secret information without Milliman's authorization and in violation of the duties imposed upon him.

173. Milliman's forensic examination of Defendant's Milliman-issued computer is ongoing. The presently known facts—including Defendant's advance knowledge that he was joining Aon, his continued access to Milliman's trade secrets, his deliberate creation of a portable sent-mail compilation, his abrupt departure, and the substantial overlap between his Milliman responsibilities and his announced Aon responsibilities—support a plausible inference of actual acquisition or retention and a substantial threat of unauthorized use or disclosure.

174. Defendant knew or had reason to know that any acquisition, retention, disclosure, or use of Milliman's trade secrets outside the performance of his Milliman duties was unauthorized and in violation of his contractual, fiduciary, and statutory obligations.

175. Defendant has thereby actually misappropriated and, unless restrained, threatens imminently to use or disclose Milliman's trade secrets for his own benefit and for the competitive benefit of Aon.

176. Even apart from any deliberate disclosure, Defendant's detailed and current knowledge of Milliman's pricing strategy and technology roadmap, combined with the substantial overlap in his new responsibilities, creates an immediate and substantial risk that he will rely upon Milliman's trade secrets when setting PathWise strategy, overseeing its implementation programs,

expanding its client solutions, developing its product capabilities, and advancing its strategic relationships.

177. Once Milliman's trade secrets are disclosed to or used for the benefit of a direct competitor, their secrecy and competitive value cannot be fully restored.

178. Unless Defendant is enjoined, Milliman will suffer immediate and irreparable harm, including loss of secrecy, loss of competitive advantage, impairment of client relationships and business opportunities, accelerated competition from Aon, damage to Milliman's goodwill, and harm that cannot be fully measured or remedied through an award of money damages.

179. Under 18 U.S.C. § 1836(b)(3), Milliman is entitled to injunctive relief preventing the actual or threatened misappropriation of its trade secrets and requiring affirmative measures necessary to protect and preserve those trade secrets. The DTSA authorizes appropriate injunctive relief, subject to its statutory limits on employment restraints.

180. Milliman is also entitled to recover its damages, any unjust enrichment not otherwise included in its damages, exemplary damages to the extent Defendant's misappropriation is proven willful and malicious, reasonable attorneys' fees as authorized by law, and such other relief as the Court deems just and proper.

**Count II: Actual and Threatened Misappropriation of Trade Secrets**
**(Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*)**

181. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

182. Milliman owns valuable confidential business, financial, scientific, technical, and economic information—including the pricing strategy, technology roadmap, methodologies, plans, processes, analyses, architecture, and related information described above—that constitutes trade secrets under the Illinois Trade Secrets Act.

183. Milliman's trade secrets are sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who could obtain economic value from their disclosure or use.

184. Milliman's trade secrets are the subject of efforts reasonable under the circumstances to maintain their secrecy, including access restrictions, password-protected systems, contractual confidentiality obligations, return-of-information requirements, internal policies, and other protections described above.

185. Defendant obtained knowledge of Milliman's trade secrets through his position as a Milliman principal and through his direct and substantial involvement in developing Milliman's pricing strategy and access to the Technology Roadmap.

186. Defendant acquired that knowledge subject to express contractual and fiduciary duties requiring him to maintain the information in confidence, use it solely for Milliman's benefit, and return it upon termination of his employment.

187. By at least June 1, 2026, Defendant had determined that he would leave Milliman to join Aon and lead the North American strategy of PathWise, a technology platform that competes directly with Milliman Integrate.

188. After deciding to join Aon, Defendant continued to possess and access Milliman's confidential information and trade secrets while serving as a Milliman principal.

189. During that period, Defendant deliberately created a separate Excel compilation of his sent-email activity containing recipients, subject lines, dates, and other information capable of identifying and organizing Milliman clients, contacts, projects, proposals, business opportunities, and personnel.

190. On information and belief, and as further supported by Milliman's ongoing investigation, Defendant acquired, retained, copied, transferred, or maintained control of Milliman trade-secret information for purposes outside the authorized performance of his duties for Milliman.

191. Defendant knew or had reason to know that such acquisition or retention was improper because:

a. the information belonged to Milliman;

b. the information was provided to him solely for Milliman business purposes;

c. he was contractually obligated to maintain its confidentiality and return it upon departure;

d. he owed Milliman fiduciary duties of loyalty and confidentiality;

e. he had already determined that he would join a direct competitor; and

f. the information would be directly useful in his competing position.

192. Defendant's unauthorized acquisition or retention of Milliman's trade secrets constitutes actual misappropriation within the meaning of the Illinois Trade Secrets Act.

193. Defendant also threatens to disclose or use Milliman's trade secrets without Milliman's consent.

194. The threat of use or disclosure is concrete and imminent because Aon has appointed Defendant to lead the North American strategy for PathWise and to oversee the same types of technology strategy, product development, implementation, client solutions, and strategic relationships about which Defendant possesses Milliman's most current and competitively sensitive information.

195. Milliman's pricing strategy and technology roadmap would provide Defendant and Aon with an immediate competitive advantage by permitting them to:

a. anticipate Milliman's pricing and negotiation strategy;

b. target or undercut Milliman in particular client opportunities;

c. leverage advance knowledge of Milliman's product-development priorities and strategic roadmap;

d. anticipate Milliman's product-development sequence and timing;

e. accelerate competing PathWise capabilities;

f. avoid substantial research, analysis, testing, and development costs;

g. target the same AI, cloud, asset-modeling, data-management, and integration use cases; and

h. compete for Milliman clients and prospects with inside knowledge of Milliman's strategy.

196. The combination of Defendant's intimate knowledge of Milliman's trade secrets, his conduct while preparing to depart, his creation of a portable sent-mail compilation, his abrupt resignation, and his substantially overlapping role at Aon creates a substantial and imminent threat of misappropriation.

197. Defendant's actual and threatened acquisition, disclosure, or use of Milliman's trade secrets without Milliman's consent constitutes misappropriation under the Illinois Trade Secrets Act. ITSA defines misappropriation to include improper acquisition and unauthorized disclosure or use by a person who knew or had reason to know that the information was obtained under circumstances creating a duty to maintain its secrecy or limit its use.

198. Milliman has suffered and, unless Defendant is restrained, will continue to suffer irreparable harm, including the loss of secrecy and competitive value of its trade secrets, damage to client relationships and goodwill, lost business opportunities, and unfair acceleration of Aon's competing technology and commercial strategy.

199. These injuries cannot be adequately remedied through money damages because, once disclosed or used by a competitor, Milliman's trade secrets cannot be made secret again, and the full effect of Aon's resulting competitive advantage cannot readily be identified or calculated.

200. Under 765 ILCS 1065/3, actual or threatened misappropriation may be enjoined, and the Court may compel affirmative acts appropriate to protect a trade secret.

201. Milliman is entitled to temporary, preliminary, and permanent injunctive relief prohibiting Defendant from acquiring, retaining, using, or disclosing Milliman's trade secrets and requiring him to identify, preserve, return, and refrain from destroying all Milliman information and property in his possession, custody, or control.

202. Milliman is also entitled to recover its actual damages, any unjust enrichment caused by the misappropriation that is not otherwise taken into account in computing damages, exemplary damages to the extent the misappropriation is proven willful and malicious, reasonable attorneys' fees as authorized by law, and all other appropriate relief.

**Count III: Breach of Contract**
**(Breach of Trade Secret & Client Information Agreement)**

203. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

204. On or about November 11, 2024, Defendant entered into an Employee Trade Secret and Client Information Agreement with Milliman. *See* **Exhibit 2**.

205. The Confidentiality Agreement is a valid and binding contract supported by adequate consideration, including Defendant's continued employment with Milliman, his position

as a Milliman principal, and the access Milliman provided to its clients, technology, strategic information, Confidential Information, and trade secrets.

206. Under the Confidentiality Agreement, Defendant acknowledged that Milliman's business involves performing services for clients using information Milliman considers confidential.

207. The Confidentiality Agreement defines "Confidential Information" to include nonpublic information concerning Milliman's:

a. business and technology;

b. clients and prospective clients;

c. finances;

d. plans, proposals, and practices;

e. client lists and client-contact information;

f. client requirements, preferences, and personnel;

g. systems and processes;

h. trade secrets, methods, and know-how;

i. databases and compilations;

j. software; and

k. guidelines, studies, and project models.

208. Milliman's Confidential Information includes, among other things, the nonpublic pricing architecture, technology roadmap, product-development plans, client information, strategic plans, implementation methods, technical analyses, and related information described in the preceding allegations.

209. Under the Confidentiality Agreement, Defendant agreed that he would use Milliman's Confidential Information solely as necessary to serve Milliman clients within the scope of his responsibilities for Milliman.

210. Defendant further agreed to maintain Milliman's Confidential Information in strict confidence and not to use, reproduce, copy, retain, disclose, or provide that information for any unauthorized purpose or for the benefit of himself or another person or entity.

211. Defendant also agreed that all qualifying work product, developments, inventions, materials, and other property created in connection with his Milliman work would belong to Milliman or the applicable Milliman entity.

212. Upon the termination of his employment, Defendant was required to return to Milliman all materials furnished to him in connection with his employment, including all materials containing, reflecting, or derived from Milliman's Confidential Information.

213. Defendant's obligations under the Confidentiality Agreement continued after the termination of his employment.

214. The Confidentiality Agreement provides that a breach or threatened breach may cause Milliman irreparable injury and authorizes Milliman to seek temporary, preliminary, and permanent injunctive relief, in addition to other available remedies.

215. Milliman performed all obligations required of it under the Confidentiality Agreement.

216. Milliman employed Defendant as a principal, compensated him for his services, entrusted him with substantial client and business responsibilities, and provided him access to Milliman's most sensitive pricing, technology, product, client, and strategic information.

217. By at least June 1, 2026, Defendant knew that he would leave Milliman to join Aon, a direct competitor of Milliman in the market for life actuarial technology and related services.

218. Despite having decided to join Aon, Defendant continued to occupy his position of trust as a Milliman principal and continued to access and possess Milliman's Confidential Information.

219. During that period, Defendant created or caused to be created an Excel spreadsheet containing a portable and sortable compilation of his sent-email activity.

220. The spreadsheet included recipients, subject lines, dates, and other information identifying or reflecting Milliman clients, contacts, projects, proposals, business opportunities, internal personnel, and professional communications.

221. The spreadsheet was separate from Milliman's ordinary email interface and was capable of being searched, sorted, copied, transferred, retained, and used outside Milliman's systems.

222. Creating or retaining such a compilation for use outside the performance of Defendant's Milliman duties was not authorized by Milliman and was inconsistent with Defendant's obligation to use Milliman's Confidential Information solely for Milliman's benefit.

223. On July 20, 2026, Defendant resigned from Milliman on approximately 24 hours' notice.

224. Defendant did not provide Milliman sufficient time to conduct an orderly review of his materials, client responsibilities, or handling of Milliman information before his departure.

225. Upon his departure, Defendant was obligated to return all Milliman Confidential Information and all copies, compilations, extracts, summaries, or other materials containing or reflecting such information.

226. On information and belief, Defendant failed to return, delete, or relinquish possession or control of all Milliman Confidential Information, including information reflected in or derived from the sent-mail spreadsheet.

227. Defendant breached the Confidentiality Agreement by one or more of the following acts:

a. using Milliman's Confidential Information for purposes outside the authorized performance of his duties for Milliman;

b. creating a separate and portable compilation of Milliman client, project, contact, and communication information while preparing to join a competitor;

c. copying, compiling, retaining, or transferring Milliman Confidential Information without authorization;

d. failing to return or relinquish possession and control of all Milliman Confidential Information upon the termination of his employment;

e. retaining materials containing or reflecting Milliman Confidential Information after his departure;

f. using or threatening to use Milliman's Confidential Information for his own benefit or for the benefit of Aon; and

g. engaging in such other breaches as Milliman's ongoing forensic investigation may establish.

228. Defendant has also repudiated or threatened to breach his continuing contractual obligations by accepting a substantially overlapping position in which Milliman's Confidential

Information would be immediately useful to him and by failing to provide adequate assurances that all Milliman information has been returned, preserved, and will not be used or disclosed.

229. Aon appointed Defendant as North America Managing Director of PathWise and announced that he will lead PathWise strategy, oversee implementation programs, expand client solutions, advance strategic relationships, and oversee the design and delivery of PathWise solutions.

230. Those responsibilities substantially overlap the responsibilities through which Defendant developed and acquired Milliman's Confidential Information, including Milliman's pricing strategy and technology roadmap.

231. Milliman's Confidential Information would permit Defendant and Aon to anticipate Milliman's strategy, identify and exploit its current technology features and development roadmap, accelerate development of competing products, structure competing pricing, target Milliman's clients and prospects, and avoid substantial independent development costs.

232. Unless Defendant is restrained from retaining, using, or disclosing Milliman's Confidential Information, Milliman will suffer immediate and irreparable injury, including the loss of confidentiality and competitive advantage, damage to client relationships and goodwill, lost business opportunities, and harm that cannot be fully calculated or remedied through money damages.

233. Defendant's breach and threatened breach have caused and will continue to cause Milliman damage.

234. Milliman is entitled to temporary, preliminary, and permanent injunctive relief enforcing Defendant's obligations under the Confidentiality Agreement, including relief:

a. prohibiting Defendant from retaining, using, copying, disclosing, or providing Milliman's Confidential Information;

b. requiring Defendant to identify and preserve all Milliman information and property in his possession, custody, or control;

c. requiring the return or verified deletion of all Milliman information, subject to appropriate forensic preservation;

d. requiring Defendant to identify all persons and entities to whom Milliman information was provided or made available; and

e. requiring such other affirmative measures as are necessary to prevent further breach and preserve the status quo.

235. Milliman is also entitled to damages, costs, attorneys' fees to the extent authorized by the Confidentiality Agreement or applicable law, and all other appropriate relief.

**Count IV: Breach of Contract**
**(Customer Non-Solicitation)**

236. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

237. On or about November 11, 2024, Defendant entered into an Employee Non-Solicitation Agreement with Milliman. *See* **Exhibit 3**.

238. The Non-Solicitation Agreement is a valid and binding contract supported by adequate consideration, including Defendant's employment as a Milliman principal, his compensation (which included an annual salary more than adequate to enforce the Agreement), and the access Milliman provided to its client relationships, client goodwill, Confidential Information, and business opportunities.

239. The Non-Solicitation Agreement was intended to protect Milliman's legitimate interests in its client relationships, client goodwill, Confidential Information, and workforce.

240. Under the Non-Solicitation Agreement, Defendant agreed that, during the two-year period following the termination of his Milliman employment, he would not solicit consulting assignments from a Milliman client with whom he had “professional contact” during the final two years of his Milliman employment.

241. Defendant also agreed that, during the restricted period, he would not accept consulting assignments from such covered Milliman clients.

242. The Non-Solicitation Agreement further provides that, if Defendant becomes associated with another consulting firm that accepts an assignment from a covered Milliman client, Defendant will not work on or participate in that assignment during the restricted period.

243. The Non-Solicitation Agreement defines “professional contact” to include a client: a. for whom Defendant performed work on Milliman’s behalf; or b. about whom Defendant accessed or used information in performing his Milliman responsibilities.

244. The restriction therefore applies to the Milliman clients with whom Defendant developed relationships, for whom he performed services, or about whom he obtained information through his senior position in the Life RTC practice during the two years preceding his departure.

245. Those covered clients include numerous life insurance companies and financial services firms.

246. During his final two years at Milliman, Defendant had professional contact with those clients by:

a. advising them concerning actuarial technology and implementation;

b. participating in client meetings and communications;

c. developing or overseeing client solutions;

d. participating in proposals, pricing, negotiations, or business-development activity; and

e. accessing or using information concerning the clients' requirements, systems, personnel, preferences, and business priorities.

247. Milliman invested substantial professional resources, time, and expense in developing and maintaining its relationships and goodwill with these clients.

248. Defendant obtained access to those relationships and client-specific information solely through his association with Milliman and while acting on Milliman's behalf.

249. Milliman performed all obligations required of it under the Non-Solicitation Agreement.

250. On July 20, 2026, Defendant resigned from Milliman and accepted employment with Aon, a direct competitor of Milliman in the life actuarial technology and consulting market.

251. On July 21, 2026, Aon appointed Defendant as North America Managing Director of PathWise, Aon's life-actuarial modeling technology.

252. According to Aon, Defendant will lead PathWise strategy in North America, oversee implementation programs, expand client solutions, advance strategic relationships, and oversee the design and delivery of PathWise solutions.

253. Aon further stated that its Life Solutions team provides actuarial advisory services and PathWise technology to life and annuity insurers, asset managers, private-equity firms, and other stakeholders in the same market served by Milliman.

254. Defendant's new responsibilities necessarily involve developing and expanding relationships with the same types of institutions he advised and served while employed by Milliman.

255. Before his departure, Defendant created a portable and sortable spreadsheet cataloguing his sent-email activity, including client recipients, subject lines, dates, projects, and other information useful in identifying and organizing Milliman client relationships and opportunities.

256. Defendant's creation of that compilation, combined with his substantially overlapping Aon responsibilities and Aon's express directive that he expand client solutions and strategic relationships, creates an immediate and substantial threat that he will solicit, accept assignments from, or work on assignments for clients covered by the Non-Solicitation Agreement.

257. On information and belief, Aon hired Defendant in part because of his experience and relationships in the life actuarial technology market, including the client experience and strategic knowledge he gained through Milliman.

258. On information and belief, Aon has assigned, intends to assign, or is preparing to assign Defendant responsibility for business-development, implementation, strategy, or client work.

259. By engaging in such conduct, Defendant has breached the Non-Solicitation Agreement.

260. Alternatively, and at minimum, Defendant has threatened an imminent breach of the Non-Solicitation Agreement by accepting a position expressly requiring him to expand competing client solutions and strategic relationships in the same market, while possessing a detailed and portable compilation of Milliman's client communications and current knowledge of covered clients' requirements, priorities, and opportunities.

261. The threatened breach is not based merely on Defendant's employment by a competitor. It arises from:

a. the specific client-facing and business-development responsibilities Aon publicly assigned to him;

b. the substantial overlap between those responsibilities and his work for Milliman;

c. his extensive professional contact with Milliman clients;

d. his current knowledge of those clients' needs, projects, pricing, systems, and decision-makers; and

e. his creation of a portable index of Milliman client communications before his departure.

262. Defendant's breach or threatened breach would deprive Milliman of the benefit of its agreement and permit Defendant and Aon to exploit client relationships and goodwill developed at Milliman's expense.

263. The loss or impairment of Milliman's client relationships and goodwill would cause immediate and irreparable injury that cannot be fully measured or remedied through an award of money damages.

264. The Non-Solicitation Agreement expressly recognizes the inadequacy of monetary relief and authorizes Milliman to seek temporary, preliminary, and permanent injunctive relief for a breach or threatened breach.

265. Milliman is entitled to temporary, preliminary, and permanent injunctive relief:

a. prohibiting Defendant from soliciting consulting assignments from covered Milliman clients;

b. prohibiting Defendant from accepting consulting assignments from covered Milliman clients;

c. prohibiting Defendant from working on or participating in assignments for covered Milliman clients through Aon or another consulting firm;

d. requiring Defendant to identify any covered clients with whom he or Aon has communicated concerning potential or actual assignments;

e. preserving all communications, proposals, assignment records, and other evidence relating to covered clients; and

f. awarding such other relief as is necessary to enforce the Nonsolicitation Agreement and preserve the status quo.

266. Milliman has suffered and will continue to suffer damages as a result of Defendant's breach or threatened breach in an amount to be determined in arbitration.

267. Milliman is also entitled to recover contractual remedies, costs, attorneys' fees to the extent permitted by the Non-Solicitation Agreement or applicable law, and all other appropriate relief.

**Count V: Breach of Fiduciary Duty & Duty of Loyalty**

268. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

269. As a principal and senior employee of Milliman, Defendant occupied a position of trust and confidence and owed Milliman fiduciary duties, including duties of loyalty, candor, good faith, confidentiality, and fair dealing.

270. Those duties required Defendant, while employed by Milliman, to act in Milliman's interests, protect its confidential information and trade secrets, refrain from assisting a competitor, avoid conflicts between his personal interests and Milliman's interests, and disclose material facts concerning conduct adverse to Milliman.

271. Defendant was permitted to participate in Milliman's most sensitive client, pricing, technology, product-development, and strategic matters because Milliman trusted him to use that information and authority solely for Milliman's benefit.

272. By at least June 1, 2026, Defendant knew that he would leave Milliman to join Aon, a direct competitor in the market for life actuarial modeling technology and related consulting services.

273. After deciding to join Aon, Defendant continued to serve as a Milliman principal, receive compensation from Milliman, communicate with Milliman clients, participate in Milliman business, and possess access to Milliman's confidential information and trade secrets.

274. During that period, Defendant was acting under an undisclosed conflict of interest. His personal interest in preparing for his role with Aon was directly adverse to Milliman's interest in protecting its clients, business opportunities, technology, confidential information, and competitive position.

275. Defendant did not disclose that conflict to Milliman.

276. Instead, while continuing to serve as a Milliman principal, Defendant engaged in conduct designed to advance his anticipated relationship with Aon and to position himself to compete against Milliman.

277. That conduct included, among other things:

a. continuing to access and use Milliman's confidential information and trade secrets after he had determined that he would join Aon;

b. creating or causing to be created a portable and sortable Excel compilation of his sent-email activity, including client recipients, subject lines, dates,

projects, and other information capable of identifying Milliman clients, contacts, opportunities, and personnel;

c. obtaining or retaining detailed knowledge concerning Milliman's pricing strategy, technology roadmap, product-development priorities, implementation plans, current limitations, client relationships, and business opportunities;

d. failing to disclose material facts concerning his anticipated competitive employment and activities undertaken in preparation for that employment;

e. continuing to hold himself out to Milliman, its personnel, and its clients as a loyal Milliman principal while acting, on information and belief, to advance interests adverse to Milliman; and

f. abruptly resigning on approximately 24 hours' notice after a period during which he had already committed to join Aon.

278. Defendant's disloyal conduct was not limited to lawful preparation to compete following the end of his employment.

279. During the period between approximately June 1 and July 20, 2026, Defendant remained subject to fiduciary duties to Milliman while simultaneously preparing to assume a senior leadership position with Aon.

280. During that same transition period, Milliman suffered substantial disruption to one of its largest client relationships.

281. Before and during the disruption of that relationship, Defendant had substantial knowledge of, or access to confidential information concerning the client, including the client's needs, decisionmakers, pricing, projects, implementation, strategy, and unique concerns.

282. The client relationship is confidential and commercially sensitive. Milliman therefore identifies the client in this Complaint as Client A.

283. Client A was a significant Milliman client about whom Defendant possessed current and competitively sensitive information.

284. During the almost two-month period in which Defendant knew he would join Aon but remained employed by Milliman, the relationship with Client A was interrupted, diminished, terminated, transferred, or otherwise materially impaired.

285. On information and belief, Defendant participated in, facilitated, influenced, or failed to protect against conduct that contributed to the disruption of Client A's business while he remained obligated to act loyally for Milliman.

286. At minimum, Defendant failed to disclose material facts concerning his divided loyalties and his anticipated work for a direct competitor while continuing to participate in or influence matters affecting Client A.

287. Defendant's conduct deprived Milliman of the honest, loyal, and disinterested services for which Milliman compensated him.

288. Defendant breached his fiduciary duties and duty of loyalty by:

a. acting for or on behalf of interests adverse to Milliman while continuing to serve as a Milliman principal;

b. failing to disclose his conflict of interest and divided loyalties;

c. using or positioning himself to use Milliman's confidential information, trade secrets, client relationships, and business opportunities for his own benefit or the benefit of Aon;

d. participating in, facilitating, or failing to protect against the impairment of Client A while owing Milliman undivided loyalty;

e. preparing to compete through means that exceeded lawful preparation and involved the use of Milliman information, resources, relationships, or position;

f. compiling, retaining, or organizing Milliman client and communication information for purposes outside the performance of his Milliman duties;

g. concealing material competitive activity while continuing to accept compensation and exercise authority as a Milliman principal; and

h. engaging in such other disloyal conduct as Milliman's ongoing forensic investigation and expedited discovery may establish.

289. The facts concerning Client A, Defendant's advance commitment to Aon, the sent-mail compilation, his continued access to Milliman's confidential information, and the substantial overlap between his Milliman and Aon responsibilities support a plausible inference that Defendant acted as a dual agent during the final weeks of his Milliman employment.

290. As a direct and proximate result of Defendant's breaches, Milliman has suffered and will continue to suffer substantial harm, including:

a. impairment of Client A and related revenues;

b. loss of business opportunities;

c. damage to client relationships and goodwill;

d. loss of the value of Defendant's loyal services;

e. investigative, forensic, and remedial costs;

f. unfair competitive injury; and

g. other damages to be established in arbitration or at trial.

291. Milliman is entitled to recover compensation paid to Defendant during the period of his disloyalty, together with any profits, compensation, or benefits he obtained as a result of his breach, to the extent permitted by law.

292. Defendant's continuing possession, use, or disclosure of Milliman information and his continuing participation in matters involving Client A or other Milliman clients threaten additional injury to Milliman.

293. Unless Defendant is restrained, Milliman will suffer irreparable harm, including further loss of confidential information, client relationships, goodwill, competitive position, and business opportunities that cannot be fully measured or remedied by money damages.

294. Milliman is entitled to temporary, preliminary, and permanent injunctive relief, damages, disgorgement, forfeiture of compensation to the extent permitted by law, costs, and such other relief as the Court deems just and proper.

295. NOW, Milliman seeks judgment in its favor on Counts I-V and all damages that may be proved at a trial or hearing, its attorney's fees and costs, and any other relief this Court deems necessary and just.

**Count VI: Injunctive Relief**

296. Milliman repeats and realleges all paragraphs of this Complaint as if repeated here.

297. As alleged above, Defendant has actually or threatened to misappropriate Milliman's trade secrets, breached and threatens further breach of his contractual obligations, and breached his fiduciary duties and duty of loyalty.

298. Milliman has a reasonable likelihood of success on the merits of one or more of its claims.

299. Milliman possesses specifically identifiable, valuable, and nonpublic confidential information and trade secrets concerning its pricing strategy, technology roadmap, Milliman Integrate platform, product development, implementation strategy, client relationships, and business opportunities.

300. Milliman took reasonable measures to preserve the confidentiality and secrecy of that information, including access restrictions, password-protected systems, confidentiality agreements, return-of-information obligations, internal policies, and other safeguards.

301. Defendant acquired the information because Milliman entrusted him with a senior principal position and gave him access for the limited purpose of performing his responsibilities for Milliman.

302. By at least June 1, 2026, Defendant knew that he would leave Milliman for Aon, a direct competitor.

303. After reaching that decision, Defendant continued to serve as a Milliman principal and continued to possess access to Milliman's most sensitive business and technical information.

304. During that period, Defendant created a portable and sortable spreadsheet cataloguing his sent-email activity and containing information identifying Milliman clients, contacts, projects, proposals, opportunities, and personnel.

305. During the same transition period, Milliman suffered substantial impairment of Client A, one of its largest client relationships, with value approaching seven figures.

306. On information and belief, Defendant participated in, facilitated, influenced, or failed loyally to protect against the impairment of Client A while simultaneously preparing to assume a competing position with Aon.

307. Defendant resigned on approximately 24 hours' notice and thereafter accepted a position as Aon's North America Managing Director of PathWise.

308. In that position, Defendant will lead PathWise strategy, oversee implementation programs, expand client solutions, advance strategic relationships, and oversee the design and delivery of a technology platform that competes directly with Milliman Integrate®.

309. Defendant's new responsibilities substantially overlap the responsibilities through which he developed and acquired Milliman's confidential information and trade secrets.

310. Defendant's conduct and new responsibilities create an immediate and concrete threat that he will retain, use, disclose, or rely upon Milliman's confidential information and trade secrets for his own benefit and for Aon's competitive benefit.

311. There is no adequate remedy at law for the threatened loss of secrecy and competitive value resulting from the disclosure or use of Milliman's trade secrets and confidential information.

312. Once such information is disclosed to or used by a direct competitor:

a. its secrecy cannot be restored;

b. the competitor may permanently retain the benefit of Milliman's research, development, analysis, and investment;

c. Milliman cannot reliably identify every decision, proposal, pricing strategy, product-development priority, or client communication influenced by the information;

d. the full resulting competitive harm cannot readily be traced or quantified; and

e. money damages cannot recreate the lost confidentiality, goodwill, relationships, or competitive position.

313. Milliman also faces irreparable harm to Client A and other client relationships because those relationships depend upon trust, continuity, confidential knowledge, and goodwill that cannot be fully replaced or valued after they are disrupted.

314. The balance of harms favors Milliman.

315. The requested relief would require Defendant only to comply with his existing statutory, contractual, and fiduciary obligations and refrain from using Milliman information, interfering with protected client relationships, or benefiting from disloyal conduct.

316. By contrast, denial of relief would permit Defendant and Aon to obtain an unfair and potentially irreversible advantage from information, relationships, and opportunities developed at Milliman's expense.

317. The requested relief would not prevent Defendant from using his general actuarial knowledge, professional skill, experience, or information available through lawful and independent means.

318. The public interest favors enforcement of valid agreements, protection of trade secrets, preservation of fair competition, and prevention of fiduciary disloyalty.

319. The public interest does not favor permitting a senior principal to exploit confidential information, client relationships, or business opportunities entrusted to him while acting under undisclosed divided loyalties.

320. Milliman has acted promptly after discovering the material facts concerning Defendant's conduct, his anticipated and actual role at Aon, and the threat to Milliman's information and business.

321. Milliman therefore is entitled to temporary, preliminary, and permanent injunctive relief, including an order:

a. prohibiting Defendant from using, disclosing, transmitting, copying, retaining, or providing to any person or entity Milliman's trade secrets or confidential information;

b. prohibiting Defendant from destroying, altering, deleting, concealing, or failing to preserve documents, electronically stored information, devices, accounts, communications, or data relating to Milliman, Aon, Client A, or the matters alleged in this action;

c. requiring Defendant to preserve and identify all Milliman information in his possession, custody, or control;

d. requiring Defendant to return all Milliman property and information, subject to appropriate forensic preservation and inspection;

e. requiring Defendant to identify all persons or entities to whom Milliman information was disclosed, provided, transmitted, uploaded, displayed, or otherwise made available;

f. requiring Defendant to submit all personal devices, accounts, storage media, cloud repositories, and other locations reasonably believed to contain Milliman information to a neutral or agreed forensic examiner for preservation and targeted review;

g. prohibiting Defendant from soliciting, accepting, servicing, or working on assignments for covered Milliman clients to the extent authorized by the Employee Nonsolicitation Agreement and applicable law;

h. prohibiting Defendant from interfering with Client A or other identified Milliman client relationships through the use of Milliman confidential information, trade secrets, or conduct undertaken in breach of his contractual or fiduciary obligations;

i. requiring Defendant to disclose any communications, proposals, assignments, or work involving Client A or other covered Milliman clients;

j. prohibiting Defendant from soliciting or recruiting Milliman employees in violation of his contractual obligations;

k. directing expedited discovery necessary to determine the location, disclosure, use, and threatened use of Milliman information and the extent of Defendant's contacts with Client A and other covered clients; and

l. granting such other affirmative or prohibitory relief as is necessary to preserve the status quo and prevent further injury to Milliman.

322. Milliman is entitled to such relief under the Defend Trade Secrets Act, the Illinois Trade Secrets Act, the Parties' Agreements, and this Court's equitable authority.

323. NOW, Milliman seeks judgment in its favor on Count VI and the order of temporary, preliminary, and permanent injunctive relief, and any other relief this Court deems necessary and just.

**REQUEST FOR RELIEF**

324. FOR THE REASONS OUTLINED ABOVE, Milliman seeks the following relief:

a. Judgment in favor of Milliman on all counts;

b. A temporary restraining order, preliminary injunction, and permanent injunction restraining Defendant from violating his restrictive covenants;

c. An award of damages (compensatory, exemplary, or otherwise) in an amount to be determined at trial or hearing as a result of Defendant's misconduct;

d. An award of attorneys' fees, costs, and expenses incurred as a result of this action;

e. Such further and other legal and equitable relief as the Court deems just and necessary.

Dated: August 7, 2026

Respectfully submitted,

**MILLIMAN, INC.**

By: */s/ Kelly E. Eisenlohr-Moul*
Counsel for Milliman, Inc.

Peter Nohle, Esq.
Kelly Eisenlohr-Moul, Esq.
Jackson Lewis P.C.
150 N. Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Fax: (312) 787-4995
Peter.Nohle@jacksonlewis.com
Kelly.Eisenlohr-Moul@jacksonlewis.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION AT CHICAGO**

Milliman, Inc.

Plaintiff,

v.

Brian Fomby,

Defendant.

Case No.

Date: August 7, 2026
Judge:

**VERIFICATION**

I, Deep Patel, affirm that I have read this Verified Complaint for Emergency Injunctive Relief. Consistent with 28 U.S.C. § 1746, I attest under penalty of perjury that the statements contained in the Verified Complaint are true and complete according to the best of my knowledge, information and belief.